**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| WSOU Investments LLC | § | |
| doing business as | § | |
| Brazos Licensing and Development, | § | |
| | § | Civil Action No. 6:20-cv-00957-ADA |
| Plaintiffs, | § | Civil Action No. 6:20-cv-00958-ADA |
| | § | |
| v. | § | Jury Trial Demanded |
| | § | |
| OnePlus Technology (Shenzhen) Co., Ltd., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF (GROUP 2 PATENTS)[1]**

---

[1] Defendant OnePlus Technology (Shenzhen) Co., Ltd. files this Opening Claim Construction Brief subject to the outcome of its pending Petition for Writ of Mandamus seeking an order directing that the case be dismissed for insufficient service of process and lack of personal jurisdiction.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .............................................................................................. 1

II.   U.S. PATENT NO. 8,712,708 ("THE '708 PATENT") ................................. 2

    A.    Background ........................................................................................... 2

    B.    Agreed Construction for the '708 Patent ............................................. 3

    C.    Disputed Terms of the '708 Patent ....................................................... 3

        1.    "detect[ing] [. . .] an availability of a charger adapter" (claims 1, 14, 15) .......................................................................................... 3

III.  U.S. PATENT NO. 9,231,746 ("THE '746 PATENT") ................................. 5

    A.    Background ........................................................................................... 5

    B.    Agreed Construction for the '746 Patent ............................................. 6

    C.    Disputed Terms of the '746 Patent ....................................................... 6

        1.    "an importance of parts of channel information for the link adaptation" (claim 1, 11) ............................................................... 6

            a.    The Claims Require a Subjective Determination of Importance ............................................................................ 7

            b.    The Claims Are Indefinite Because They Do Not Permit A Reliable Determination Of Infringement ................................. 10

        2.    "a lower importance with respect to link adaptation than said at least one part" (claim 2) .................................................................. 11

        3.    "a coding level of said multi-level coding" / "coding level" (claims 1, 2, 3, 11) .......................................................................... 12

        4.    "assigning" / "assigned" (claims 1, 2, 3, 11) ......................................... 16

VII.  CONCLUSION ................................................................................................ 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2009) ................................................................... 15

*Biogen, Inc. v. Berlex Labs., Inc.*,
  318 F.3d 1132, 1140 (Fed. Cir. 2003) .......................................................... 15

*Crane Co. v. Sandenvendo Am., Inc.*,
  No. 2:07-CV-42-CE, 2009 WL 1586704 (E.D. Tex. June 5, 2009)....................................... 7

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ..............................................................7, 10

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
  815 F.3d 1314 (Fed. Cir. 2018) .................................................................. 1

*Free Stream Media Corp. v. Alphonso Inc.*,
  996 F.3d 1355 (Fed. Cir. 2021) ..............................................................15, 16

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373, 1384 (Fed. Cir. 2003) .......................................................... 10

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244, 1254–55 (Fed. Cir. 2008) ...................................................10, 11

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
  822 F. 3d 1312 (Fed. Cir. 2016).................................................................. 15

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351, 1361 (Fed. Cir. 2008)............................................................. 1

*SIPCO, LLC v. Emerson Electric Co.*,
  939 F.3d 1301, 131 U.S.P.Q.2d _ (Fed. Cir. 2019), *vacated and remanded on
  other grounds* (*Thryv*), _ S Ct. _ U.S.P.2d _, 2020 WL 314672......................................... 13

*Uniloc 2017 LLC v. Samsung Elecs. Am., Inc.*
  (No. 2:18-CV-00506-JRG, 2020 WL 248880 (E.D. Tex. Jan. 16, 2020))........................7, 8

*Versata Software, Inc. v. Zoho Corp.*,
  213 F. Supp. 3d 829 (W.D. Tex. 2016) .......................................................... 10

## TABLE OF AUTHORITIES
(continued)

**Page**

**Other Authorities**

Chambers Dictionary 12th Ed., 2011 ........................................................................ 16

New Oxford American Dictionary, 3rd Ed., 2010 ..................................................... 16

Webster's New College Dictionary, 3rd Ed., 2008 .................................................... 16

## I.     INTRODUCTION

Defendant OnePlus Technology (Shenzhen) Co., Ltd. ("Defendant" or "OnePlus") hereby submits its opening claim construction brief addressing the disputed claim terms for the Group 2 patents.[2]

The Group 2 Patents are generally directed to mobile phone technologies, including battery charging (the '708 Patent) and methods for sending information about the state of a communication channel (the '746 Patent).  For the '708 Patent, WSOU asserts claims 1, 2, 4-7, and 14-16.  The parties dispute the construction of "detect[ing] [. . .] an availability of a charger adapter" (claims 1, 14, 15).  For the '746 Patent, WSOU asserts claims 1-4, and 11.  The parties dispute the construction of "a coding level of said multi-level coding" / "coding level" (claims 1, 2, 3, 11) and "assigning" / "assigned" (claims 1, 2, 3, 11).

The remaining disputed phrases are indefinite.  WSOU contests indefiniteness, but proposes only that they should be construed with their "plain and ordinary meaning."  WSOU's declining to offer any definition underscores the indefiniteness and fails to address the dispute over what the claim means.  *See Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2018) ( "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute) (quoting *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008)).  Even where WSOU proposes an alternate construction, they still fail to resolve the indefiniteness issues.  For these reasons, WSOU's proposals should be rejected.

---

[2] U.S. Patent No. 8,712,708 ("the '708 Patent") asserted in Case No. 6:20-cv-00957-ADA and U.S. Patent No. 9,231,746 ("the '746 Patent") asserted in Case No. 6:20-cv-958-ADA.

## II.    U.S. PATENT NO. 8,712,708 ("THE '708 PATENT")

### A.    Background

The '708 patent describes estimating the time remaining to charge a rechargeable battery. Ex. A, Abstract, 1:30-32.  In accomplishing this goal, the patent uses well-known charging phases called the "constant current phase" and "constant voltage phase."  *Id.*  These phases are shown in the chart in Figure 4A.  As their names imply, during the "constant current phase" (yellow), the current is kept constant, while the voltage may vary (here, increasing), and during the "constant voltage stage" (orange), the voltage is kept constant while the current may vary (here, decreasing).  This is illustrated below:



Ex. A, Fig. 4A[3].  The patent describes calculating the amount of time remaining for a battery to be charged by determining the battery's charging phase and using data about the battery and

---

[3] All emphasis, colorization, and/or annotations added throughout, unless otherwise noted.

other characteristics to approximate time remaining in each phase.  Ex. A, 2:1-11; 6:43-58.

According to the patent, these characteristics of the battery can be stored on the device or battery

and may be used to accurately predict the remaining charging time.  Ex. A, 10:51-57 ("Step 406:

determining whether a battery charging point is in a constant current phase or in a constant

voltage phase, based on pre-determined battery charging characteristics.")

In calculating the time remaining to charge in the constant current phase, each of the

independent claims requires using "battery stored charge characteristics [that] comprise[] a

battery stored charge value based on monitored tracking of battery charging and discharging."

*See, e.g., id.* Cl. 1.

### B.    Agreed Construction for the '708 Patent

For purposes of this case only, and to reduce the scope of the dispute, OnePlus has agreed

that except for the terms identified below, and absent a construction later adopted by the court,

the claim terms of the '708 Patent shall be interpreted according to their plain and ordinary

meaning as read by a person of ordinary skill in the art at the time of the invention, in the context

of the entire patent, including the specification and drawings.

### C.    Disputed Terms of the '708 Patent

### 1.    "detect[ing] [. . .] an availability of a charger adapter" (claims 1, 14, 15)

| OnePlus's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| "detecting energy, e.g., voltage and/or current, for charging from an adapter." | Plain and ordinary meaning;<br><br>or, if the Court deems a construction is necessary: "detect[ing] [. . .] a presence of a charger adapter" |

Claim 1 recites "detecting, by an apparatus, an availability of a charger adapter."

Similarly, claims 14 and 15 recite "detecting an availability of a charger adapter" and "detect an

availability of a charger adapter," respectively.  Ex. A, Cls. 1, 14-15.  The charger adapter 50 of

the '708 patent is shown below in yellow:

3



Ex. A, Fig. 1A.

Apart from requiring that it be "detect[ed]," the term "charger adapter" is not recited elsewhere in the independent claims. Rather, the charger adapter is only referred to later in claims 5 and 6, each of which depend from claim 1. The specification says nothing about detecting the charger adapter beyond repeating the language in the claims: "[e]xample embodiments of the invention include an apparatus, comprising: **means for detecting an availability of a charger adapter**." Ex. A, 11:10-12, 10:50.

Dependent claims 5 and 6 recite "identifying ***the correct category of*** the charger adapter ***after*** detecting its availability." Ex. A, Cls. 5-6; Ex. 1005 ¶0042. The specification teaches that the "category of charger adapter…may be identified ***soon after*** the charging cable…has been connected" and the "initial charge current is specific for each…category of charger adapter." *Id.* 8:20-34. The specification and these dependent claims confirm that "detecting an availability of

a charger adapter" is distinct from identifying the category of the charger adapter.

Since the recited "detecting" is directed merely to the "*availability* of a charger adapter," and not its category, it can only be understood as detecting the presence of available current or voltage on an input line. Accordingly, the term should be interpreted to mean "**detecting charging energy (*e.g.*, voltage and/or current) from an adapter**."

## III.   U.S. PATENT NO. 9,231,746 ("THE '746 PATENT")

### A.   Background

The '746 Patent features two admittedly well-known concepts in telecommunications: "channel information for link adaptation" and multilevel encoding. "Channel information" is typically sent after receiving an initial communication to let the sender know how well they are being received. To use a now-familiar analogy, imagine a Zoom-conference: the host asks "can you hear me" and the guest may reply, for example, "yes," "you're on mute," or "it's very noise." This reply is an example of channel information. This channel information can then be used for "link adaptation," for example, when the host unmutes or closes a window to muffle the interfering sound of traffic. *See* Ex. B 1:22-26 ("[a]dapting the data transmission to the state of the channel is often referred to as link adaptation. It is known to transfer channel information describing the current state of the radio channel from the individual terminals to the base station."); 1:61-62 ("The channel information describes momentary characteristics of the channel.")

The patent describes combining this channel information with "multilevel encoding." Various schemes for multilevel encoding were also known at the time of the '746 patent. Ex. B, at References Cited (citing US2007/0019753A1 (title "Adaptive multilevel block coded modulation for OFDM systems"); WO2008/154506A1 (title "Hierarchical modulation for communication channels in single-carrier frequency division multiple access.")). The patent

describes using a multilevel encoding scheme where data on one code level will have a "high" detection probability level while data on another code level will have a "lower" detection probability level.   For example, Figure 3 is directed to "hierarchical modulation with two coding level." *Id.* at Fig. 3, 8:26-29.   In this example, certain data is assigned to a coding level with "a high priority having high detection probability level" and other data is assigned to a coding level with "[a] lower priority having a lower detection probability level."   *Id.* at Fig. 3, 8:40-47.

To secure allowance, the patentee further narrowed the claim by adding the requirement in each asserted independent claim of "subdividing . . . multiple parts of channel information according to an importance of parts of channel information for the link adaptation." This clause is discussed further below.

### B.    Agreed Construction for the '746 Patent

For purposes of this case only, and to reduce the scope of the dispute, OnePlus has agreed that except for the terms identified below, and absent a construction later adopted by the court, the claim terms of the '746 Patent shall be interpreted according to their plain and ordinary meaning as read by a person of ordinary skill in the art at the time of the invention, in the context of the entire patent, including the specification and drawings.

### C.    Disputed Terms of the '746 Patent

#### 1.    "an importance of parts of channel information for the link adaptation" (claim 1, 11)

| OnePlus's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning; <br><br> or, if the Court deems a construction is necessary: <br> "a priority of parts of channel information for the link adaptation" |

As discussed below, the element "an importance of parts of channel information for the link adaptation" is indefinite.

a.      **The Claims Require a Subjective Determination of Importance**

Claims 1 and 11 of the '746 patent require "subdividing the channel information into multiple parts of channel information according to an importance of parts of channel information for the link adaptation." These independent claims are indefinite because subdividing channel information based on "an importance of parts of channel information for the link adaptation" is inherently subjective, and would improperly necessitate an inquiry into the minds of the designer or user of the accused article to determine whether the accused "subdividing" was performed based on their subjective view of what is important.

Courts have held claims calling for such a subjective infringement assessment to be indefinite. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350–52 (Fed. Cir. 2005) (claim reciting an "aesthetically pleasing look and feel" was indefinite because the patentee's construction improperly depended on the subjective perception of the user); *Crane Co. v. Sandenvendo Am., Inc.*, No. 2:07-CV-42-CE, 2009 WL 1586704, at *13 (E.D. Tex. June 5, 2009) (claim reciting "rapidly" was not amenable to construction because "[t]he term is entirely subjective and is judged purely from the consumer's standpoint.")

Most relevant here, courts have specifically held that the recitation of "importance" in a claim calls for a subjective determination that may render the claim indefinite. *Uniloc 2017 LLC v. Samsung Elecs. Am., Inc.*, (No. 2:18-CV-00506-JRG, 2020 WL 248880, at *16–18 (E.D. Tex. Jan. 16, 2020)). The court in *Uniloc* addressed claims related both to sending and receiving "important" information. The court held that claims requiring a broadcaster to send information containing a "partition of important subject matter" were indefinite because "the 'partition of important subject matter' [was] subjective, because it requires a broadcaster to act on the 'importance' of the partition. In particular, what subject matter a broadcaster might deem to be 'important' will inevitably vary from person to person." *Id.* at *18-19. Other asserted claims, by

7

contrast, required a *receiver* to receive information *pre-coded* as important in the claim's "partition of important subject matter within an image."  The court ruled that these claims were not indefinite because these claims "are not directed to the concept of determining what subject matter in an image is important" and "[a] person of ordinary skill in the art would understand that what is inside the partition is the important subject matter to be displayed."  *Id.*

The claims in this case are analogous to the "importance" claims in *Uniloc* that were found to be indefinite .  The asserted claims of the '746 patent require "subdividing the channel information … according to an importance" of the channel information.  This "subdividing" based on "an importance" requires an accused infringer to determine the importance of parts of the channel information, and not simply to act on channel information that has already been deemed to be important.  Ex. B, Cl. 1 ("[a] method of *transmitting* channel information for link adaptation … wherein the method comprises *subdividing the channel information* into multiple parts of channel information *according to an importance* of parts of channel information to link adaptation…"); Cl. 11 ("[a] *transmitting* device  … wherein the *transmitting device* is further *configured to subdivide the channel information* into multiple parts of channel information *according to an importance* of parts of channel information to link adaptation.")  This requirement for a subjective determination of importance renders the claims indefiniteness.

Notably, the specification identifies several embodiments in which an importance determination must be made subjectively.  "Importance" is not defined in the '746 patent.  And while examples of potentially important information are provided, there is no objective ranking of important information.  For instance, the patent teaches that information for link adaptation may include "wideband information related to the whole radio channel" (Ex. B, 3:17-18) and also "payload data … received from higher protocol layers or to be forwarded to the higher

protocol layer." *Id.* at 4:2-4. But the patent ***does not*** teach how to prioritize the relative importance of such information. Rather, unspecified "situations" may at times make payload data more or less important than lower-layer channel information. Ex. B, at 4:8-19. The importance of channel information may also vary depending on whether a user is interested in a high rate of speed or more interested in assuring that the data gets delivered (even if relatively slowly). *Id.* at 4:27-30 ("When the channel is temporally unstable (e.g., at high user speed) the channel information is highly time variant and, thus, of lower importance than with temporally stable channels.") With no objective guidance from the specification, a subjective determination must be made. Infringement would thus depend on a user's subjective desires. The patent further teaches that channel information may include "coarse precoding vector" information and "refining information for refining the coarse information that characterizes a coarse precoding vector." *Id.* at 3:42-53. In other embodiments, channel information may include a Precoding Matrix Indicator (PMI) and a Channel Quality Indicator (CQI). *Id.* at 6:37-45. But again, the patent *does not* teach how a PHOSITA determines relative importance between these types of data.

The specification further confirms that "importance" cannot be objectively determined because channel information may be prioritized according to static user or manufacturer settings. Ex. B, 2:66-3:15 ("In one embodiment, the at least one coding level is assigned statically to at least one part of channel information. … Static assignments mean that the importance is temporarily constant. Changes can be made e.g. via setting operation…"). Thus, to determine whether an assignment of priority of a part of the channel information was based on its "importance" to link adaptation, a PHOSITA would have to ask the product manufacturer or user whether the "static assignment" of importance was made for purposes of improving link

adaptation, instead of, for example, saving battery life.  The demand for such a subjective

importance determination runs afoul of *Datamize, LLC.*  417 F.3d at 1350–52.

**b.    The Claims Are Indefinite Because They Do Not Permit A Reliable Determination Of Infringement**

The "importance" limitation of the '746 Patent also renders the asserted claims indefinite

because the patent teaches that what is "important" will change from moment to moment, and

location to location, making a consistent assessment of infringement impossible.  A patent is

invalid for indefiniteness where "a given embodiment would simultaneously infringe or not

infringe the claims" depending on context and environmental conditions.  *Halliburton Energy*

*Servs., Inc.* v. M-I LLC, 514 F.3d 1244, 1254–55 (Fed. Cir. 2008) (*citing Geneva*

*Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003)).  Courts

in this district have applied this principle specifically to mobile device patents, holding that a

claim limited to "space-constrained display" was indefinite because whether a display was

"space constrained" was determined by dynamic inputs from the user.  *Versata Software, Inc. v.*

*Zoho Corp.*, 213 F. Supp. 3d 829, 837–38 (W.D. Tex. 2016) ("whether a certain user is

infringing the asserted claims is context-dependent, and a context-dependent infringement

determination is likely indefinite" *citing Halliburton*).

Here, the patent specifically teaches that what information is "important" to link

adaptation will change based on the particular environment (*i.e.*, the particular cellular network

or area) in which it is used.  "For instance," the specification explains, "when frequency-

selective resource allocation is performed in a frequency-selective environment, the wideband

channel information is less effective for link adaptation than the sub-band information."  Ex. B,

3:30-33.  But "[w]hen the user leaves the frequency-selective environment, its channel flattens.

Then, the importance of sub-band channel information decreases."  *Id.* at 3:37-39.  Thus,

10

according to the patent, whether wideband information is important or not depends on the environment in which the device is being used.  A PHOSITA has no way to determine whether a device's prioritization of wideband over sub-band information satisfies the "importance" limitation unless they also know the environment in which that device was used.  This context-specific infringement is precisely the type of indeterminate claim that the Federal Circuit invalidated in *Halliburton*.  514 F.3d at 1254-55.

WSOU's proposed construction—which merely replaces the claim term "importance" with "priority"—is wrong.  Simply because certain information may be given priority does not mean that it is more important to link adaption.  Nor does WSOU's construction cure the indefiniteness.  The specification does not provide a formula for determining how to assign a "priority" of channel information for the link adaptation, and an infringement determination would still call for a subjective analysis of whether the user or manufacturer was "prioritizing" channel information for link adaptation.  And what information that should be "prioritized" for link adaptation would still change moment to moment.  WSOU's proposed construction does not rescue the claims from indefiniteness.

> ## 2. "a lower importance with respect to link adaptation than said at least one part" (claim 2)

| OnePlus's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning; <br><br> or, if the Court deems a construction is necessary: "a lower priority with respect to link adaptation than said at least one part" |

For the same reasons that "an importance of parts of channel information for the link adaptation" is indefinite, claim 2's requirement of "a lower importance with respect to link adaptation than said at least one part" is also indefinite.  As already explained, the '746 patent does not tether its determination of "importance" to any objective criteria; "importance" can

even change, for example, based on whether the device should be providing a "fast" connection. Ex. B, 4:27-30. And even if the importance of channel information could be determined objectively, such importance would vary depending on the operating environment. *Id.* at 3:30-39. This uncertainty of infringement renders the claim indefinite.

The phrase "lower importance" occurs only twice in the specification, and neither mention provides any objective guidance. The first time, it merely parrots back the language of the claim. *Id.* at 2:49-50. This gives no objective indicia of what parts will have higher or lower priorities in a particular scenario, leaving the choice to the user's subjective preference. Later, in describing the scenario where channel information is less important for high-speed users, the patent explains "at higher user speed[] the channel information is highly time variant and, thus, of lower importance than with temporally stable channels." *Id.* at 4:27-30. But this simply explains that all "channel information" is less important, it does not provide objective criteria to a PHOSITA to determine which parts of the channel information are more important than other parts. Like claims 1 and 11, claim 2 is indefinite.

> ### 3.   "a coding level of said multi-level coding" / "coding level" (claims 1, 2, 3, 11)

| OnePlus's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| "a distinct detection probability level" | Plain and ordinary meaning;<br><br>or, if the Court deems a construction is necessary: "a coding level of said multi-level coding" / "coding level" |

Each of the asserted independent claims is directed to using "coding levels" of "multi-level coding." In describing the claimed invention, and without limiting the discussion to any particular embodiment, the specification explains that "[a]ssigning the at least a part of channel information to the predefined coding level ***allows for controlling the detection probability***." Ex. B, 2:18-20. Likewise, the abstract explains "[i]n order to allow for reliable and efficient transfers

of channel information (CI) and to **adapt the detection probability to the importance of CI** …

the method comprises encoding [] the channel information (CI) using multi-level coding … each

bit sequence … corresponding to a coding level … of said multilevel coding." *Id.* at Abstract.

Because the specification "explicitly ties" coding levels to relative detection probability levels,

"a skilled artisan would understand" that a coding level [of said multi-level coding] refers to a

distinct detection probability level. *SIPCO, LLC v. Emerson Electric Co.*, 939 F.3d 1301, 1308-

09, 131 U.S.P.Q.2d _ (Fed. Cir. 2019), *vacated and remanded on other grounds* (*Thryv*), _ S Ct.

_, _, 133 U.S.P.2d _, 2020 WL 314672, *1.

The specification confirms this understanding; it describes the "coding level" as

corresponding to detection probability and never describes it as serving any other function. *See,*

*e.g.,* Ex. B, 2:9-10 ("Preferably, **each coding level corresponds to a level of a detection**

**probability**"); 2:27-28 ("a robust coding level (i.e., high detection rate); 2:50-53 ("in other

words, the parts of the channel information are prioritized by assigning to them **different coding**

**levels having different detection probabilities**"); 7:46-50 (describing figure 2, "[e]ach **coding-**

**level 0 [through] n corresponds to a detection probability level p(1) [through] (n)**. … channel

information CI having a given index (i) has a higher detection probability level p(i) than any

other part p(j) with j>(i)"); 10:43-45 (describing figure 4 as showing "[a] coding level having a

high detection probability level p(1) is assigned to the channel information … .   A coding level

having a low detection probability level p(2)<p(1) is assigned to the payload sequence d.")

This is also seen in the figures. For example, in figure 2, the multilevel coding is implemented by mapper 39—mapping data sequences to the appropriate portion of the radio signal generated by the encoder in accordance with the assigned detection probability levels p1, p2 … pn. Ex. B, 7:57 ("the mapper 39 maps the bit sequences … such that the above-mentioned condition regarding the detection probability levels p(1), p(2), …, p(n) holds.")



Fig. 2

| 31 | transmission line |
| 35 | transmitter element |
| CI | channel information |
| $ci_1$, $ci_2$ | channel information subparts |
| d | data sequence |
| 37 | prioritizing element |
| $c_1$, $c_2$, $c_n$ | bit sequences |
| $p_1$, $p_2$, $p_n$ | probability levels |
| 19 | encoder |
| 39 | mapper |
| m | mapping information generated by the mapper 39 |
| 29 | radio channel |
| 27 | decoder |
| 41 | receiver element |

The specification also teaches how different modes of multilevel coding all result in different coding levels with distinct detection probability levels. For example, the patent describes using one coding level with a "high" detection probability level and one coding level with a "low" detection probability level. *Id.* at 8:40-47. Specifically, Figure 3 teaches using a hierarchical modulation scheme using coding levels, where bit sequences "having the highest priority" are mapped to the "outer symbols 43" of the modulation with a high probability of detection. Ex. B, 8:26-9:18. In figure 4, the specification explains that the higher-priority "coarse precoding vector" is assigned a coding level "having a high detection probability" so that

even "[i]n the case of transmission errors … the coarse information … can be decoded anyway." *Id* at 10:19-22.

Fundamentally, "the claims cannot 'enlarge what is patented beyond what the inventor has described as the invention.'" *Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (*quoting Biogen, Inc. v. Berlex Labs., Inc*., 318 F.3d 1132, 1140 (Fed. Cir. 2003)). Here, as shown above, the patentee clearly and repeatedly described the invention as using coding levels to improve the probability that a given part of the channel information would be detected for link adaptation. Indeed, this was key to the patent's stated goal to "adapt the detection probability to the importance of C[hannel] I[nformation]" (Ex. B, Abstract) and to "reliably and efficiently transfer the channel information between different network nodes." *Id.* at 1:36-40. Accordingly, coding levels as used in the patent would be understood by a PHOSITA to be distinct detection probability levels. *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F. 3d 1312, 1321-22 (Fed. Cir. 2016) (limiting claim terms where the embodiments "are the only instances in which the patent specifies how to achieve the [patent's] goals … [and] every description and every figure in the patent that discusses the issue" included defendant's proposed claim limitation).

Finally, a construction of "coding levels" that is not tied to distinct detection probability levels would effectively eviscerate the "multilevel coding" limitation. In *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1367 (Fed. Cir. 2021), the Federal Circuit affirmed a district court ruling that "communication session" involved two-way communication, because the specification "only graphically depicts 'communication session' with a two-sided arrow connecting the client device and the networked device," and "all references to the claimed communication session, as between the networked device and the client device, describe this

session as bidirectional."  Any other construction "would improperly read 'session' out of the

claims, because [plaintiff's] construction would then encompass any 'communication.'"  *Id.*

Here, all references to "a coding level" refer to distinct detection probably levels.  If "a coding

level" referred to any categorization based on any conceivable criteria, this multi-level coding

would not accomplish the goals of the invention and would be rendered meaningless, effectively

reading it out of the claims.

WSOU's proposal that the terms be given their "plain and ordinary meaning" (and its

alternative construction, which merely parrots back the claim language) is not helpful.

Accordingly, the Court should adopt the construction that "a coding level[ of said multi-level

coding]" means "a distinct detection probability level."

### 4.    "assigning" / "assigned" (claims 1, 2, 3, 11)

| OnePlus's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| "designating" / "designated" | Plain and ordinary meaning;<br><br>or, if the Court deems a construction is necessary: "mapping" (or) "assigning" / "mapped" (or) "assigned" |

OnePlus' proposed construction provides clarity to the court and jury by providing a

definition grounded in the plain meaning of the word "assign" while staying true to the teachings

of the '746 patent.  "Designate" is a common definition for "assign" as indicated by several

dictionaries contemporaneous with the filing of the '746 Patent.  *See* Ex. C (Chambers

Dictionary 12th Ed., 2011) ("to allot, share out; **to designate**, appoint;…"); Ex. D (New Oxford

American Dictionary, 3rd Ed., 2010) ("2. **Designate** or set (something) aside for a specific

purpose"); Ex. E (Webster's New College Dictionary, 3rd Ed., 2008) ("1. To set aside for a

particular purpose: designate.")  While other definitions of "assign" include, e.g., "to give out as

a task" or "[t]o transfer [as in law] (property, rights, or interest")" (Ex. E (Webster's)), these

definitions do not make sense in the context of the patent, where an attribute—*e.g.,* "one of said

coding levels" (Ex. B, Claim 1) or in some embodiments "[a] coding level having a high detection probability level p(1)" (*id.* at 10:43-44)—and not a task or thing is being assigned. Accordingly, construing "assigning" and "assigned" as "designating" and "designated" will provide clarity for the court and jury and the construction should be adopted.

Plaintiff's proposed alternative construction of "'mapping' (or) 'assigning' / 'mapped' (or) 'assigned'" is unhelpful and inconsistent with the specification. First, WSOU's simply repeating the word "assigned" or "assigned" is obviously not a definition. WSOU's use of the term mapping or mapped is inconsistent with how these terms are used in the specification. The specification and figures show that the mapping function is distinct from assigning coding levels, and is performed after the assigning has been done by a separate structure. Specifically, Figure 2 shows the "prioritization element 37" as "assigning coding levels" for each part of the channel information. Ex. B, Fig. 2 and 7:15-64. After this assigning step has been completed, the mapper 39 uses the assigned priority levels to map the assigned date to the appropriate portions of the radio signal during encoding:



Fig. 2

"Part of channel information c(1) designated priority p(1)"

"The prioritizing element 37 classifies the channel information CI by assigning coding levels" (7:37)

"The mapper 39 maps the bit sequences ... such that the above-mentioned condition regarding the detection probability levels p(1) p(2), . . . P(n) holds." (7:57)

17

Accordingly, the court should adopt Defendant's proposed construction that "assigning" or "assigned" as used in claims 1, 2, 3, and 11 means "designating" or "designated," respectively.

## IV.    CONCLUSION

For the foregoing reasons, the court should adopt Defendant OnePlus' proposed claim constructions.

Dated: August 24, 2021

/s/   Michael J. Lyons
Michael J. Lyons*
California Bar No. 202284
michael.lyons@morganlewis.com
Ahren C. Hsu-Hoffman
Texas Bar No. 24053269
Ahren.hsu-hoffman@morganlewis.com
Jacob J.O. Minne*
California Bar No. 294570
jacob.minne@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
T: 650.843.4000
F: 650.843.4001

Elizabeth M. Chiaviello
Texas Bar. No. 24088913
elizabeth.chiaviello@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
T: 214.466.4000
F: 214.466.4001

*Admitted *pro hac vice*

**Attorneys for Defendant OnePlus Technology (Shenzhen) Co. Ltd.**

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on August 24, 2021, a true and correct copy of the foregoing document was served via ECF on counsel of record per Local Rule CV-5.

/s/ Michael J. Lyons
Michael J. Lyons